**Harvey Joseph DUFFY, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 57603.**

Court of Criminal Appeals of Texas, En banc.

June 7, 1978.

Lonnie W. Duke and Antonio G. Cantu, San Antonio, court appointed, for appellant.

Bill M. White, Dist. Atty., John W. Harris, Jr., Charles T. Conaway and Bennie F. Steinhauser, Jr., Asst. Dist. Attys., San Antonio, for the State.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for capital murder. On September 14, 1976, the jury answered affirmatively the three special issues submitted under Article 37.-071, Vernon's Ann.C.C.P., and the punishment was accordingly assessed at death.

The sufficiency of the evidence to show that appellant committed murder in the course of robbery is not challenged. On January 14, 1976, the body of Louise Word, an eighty-year-old woman, was found in her house in a rural area of Bexar County. The evidence showed that she had been stabbed ten times with a knife. The front screen door of her house was bent and twisted, indicating a struggle had taken place. Large bloodstains were found in the living room and trails of blood led to the bedroom where the body of the deceased was found. Drawers in the house appeared to have been opened and rifled.

On January 16, 1976, appellant was arrested in Fredericksburg, where he subsequently made a confession to the crime. The evidence reflects that appellant had been in possession of checks belonging to the deceased, and that for two and one-half days appellant had been forging and cashing the checks in three cities. Other evidence found at the scene of the crime connected appellant with the murder.

Appellant raises eight grounds of error in this appeal.[1] In his first ground of error, raised for the first time on appeal, appellant alleges that the trial court failed to comply with V.T.C.A., Penal Code, Section 12.31(b) in that none of the prospective jurors were required to state *under oath* during voir dire that the mandatory penalty of life imprisonment or death would not affect his or her deliberations on any issue of fact.[2]

Article 35.02, Vernon's Ann.C.C.P., provides that after the parties in the cause have announced ready for trial and the jurors are called,

"To those present the court shall cause to be administered this oath: 'You, and each of you, solemnly swear that you will make true answers to such questions as may be propounded to you by the court, or under its directions, touching your service and qualifications as a juror, so help you God.' "

Thus, in the course of jury selection proceedings, the jury is to be sworn *before* the voir dire examination begins; therefore, any statements or answers given by prospective jurors during voir dire are given under oath.

Article 12.31(b) contemplates that when a prospective juror states whether or not his deliberations will be affected by the mandatory punishment of life imprisonment or death, his answer is to be given under oath in the same manner as all answers during the voir dire examination. Thus, the statute contemplates that a juror's qualification under this statutory provision be tested during the course of the voir dire examination, along with his qualifications as to all legal matters.

The record reflects that each prospective juror was examined by the trial court as to his or her qualification under Section 12.31(b). However, appellant contends that none of the jurors were sworn *before* they were qualified under Section 12.31(b) and that, therefore, their answers to the statutory question were not made under oath as the statute requires. Appellant contends

1. In his oral argument of this case before this Court, counsel for appellant asked that we consider as unassigned error ineffective assistance of counsel on appeal. Counsel stated, and the record reflects, that he and co-counsel were appointed to represent appellant after appellant's trial counsel had filed his first motion for new trial. Because counsel on appeal were not familiar with the trial record in the case, not having represented appellant therein, on November 12, 1976, the trial court entered an order extending counsel's time for filing an amended motion for new trial until 30 days after the court reporter completed the statement of facts. Notice of completion of the record was sent to counsel on appeal on July 14, 1977. On July 28, 1977, counsel filed objections to the record, requesting that the trial court not approve the record until the agreed-upon 30 days had expired. The record does not reflect that a hearing was ever held on this objection. The record next reflects that the trial court entered an order approving the record on August 22, 1976, some nine days after counsel's thirty-day extension had expired. In his argument before this Court, counsel represented that the trial judge had breached his agreement to extend the time for the filing of the amended motion for new trial, and argued that because of this, he was not able to effectively represent appellant in this appeal. The record, however, reflects that the trial judge honored his agreement as to the extension of time. Further, the record does not reflect that counsel ever filed or attempted to file the amended motion for new trial, which he maintained was critical in his effective representation of appellant on appeal. Thus, there is no error for this Court to consider.

2. V.T.C.A., Penal Code, Sec. 12.31(b) requires that:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

that for this reason he was deprived of a panel of legally qualified jurors, which constituted a violation of due process and equal protection.

■ Article 44.24(a), Vernon's Ann.C.C.P. provides that: ·

"The Court of Criminal Appeals shall presume . . . that the jury was *properly impaneled* and *sworn* . . . unless such matters were made an issue in the court below, or it otherwise *affirmatively* appears to the contrary from the record." (Emphasis added)

Appellant made no objection to the proceedings or the jurors at any time during the course of the trial. Neither does the record in this cause affirmatively reflect that the prospective jurors were not properly sworn before each was examined during the voir dire proceedings; the record is silent on this matter. Therefore, the statute mandates a presumption on appeal that the jury in the instant case was properly impaneled.

In *Clay v. State*, 505 S.W.2d 882 (Tex.Cr. App.1974), one ground of error before this Court was the failure of the trial court to administer the oath to the jury panel before voir dire examination, as required by Article 35.02, supra. Relying upon the language of Article 44.24, supra, we held that there was a presumption that the jury had been properly impaneled and sworn, since the defendant voiced no objection at trial and since the record did not affirmatively show that the oath was not given. Cf. *McCloud v. State*, 527 S.W.2d 885 (Tex.Cr. App.1975); *Green v. State*, 510 S.W.2d 919 (Tex.Cr.App.1974); *Davis v. State*, 507 S.W.2d 740 (Tex.Cr.App.1974); *Grant v. State*, 507 S.W.2d 732 (Tex.Cr.App.1974).

Appellant seems to argue that this presumption of regularity is inapplicable in the instant case. He contends that since Article 12.31(b) states that a prospective juror "shall be disqualified" from serving unless qualified under the statute, jurors cannot render a verdict in a capital case unless there has been compliance with Sec. 12.-31(b). This position is erroneous. In *Battie v. State*, 551 S.W.2d 401 (Tex.Cr.App.1977), we reaffirmed our holding that Sec. 12.31(b)

does not in itself constitute an oath to be administered in its own terms to each venireperson, but rather it merely provides one criteria by which each venireperson is to be qualified. Thus, we see no reason that the statutory presumption not apply in the instant case.

■ We hold that the statutory presumption on appeal that the jury was properly impaneled, and thus that they were under oath during the voir dire examination, applies in capital cases to jurors' qualifications under Sec. 12.31(b). Appellant's first ground of error is overruled.

In his second ground of error, appellant contends that he was "deprived of a fair and impartial jury trial because the verdict was the product of community pressure brought upon the jurors by the news media during the course of the trial."

The record reflects that on September 13, 1976, after appellant had testified in his own behalf but before the defense rested, the jury was recessed for lunch. Evidence in the record reflects that as the jurors filed out of the courtroom a television cameraman from a local television station was directly outside the courtroom doors, filming the outside of the courtroom. Apparently, some of the jurors were filmed during this incident. The trial judge immediately had the cameraman brought before him out of the presence of the jury, took his camera and ordered the bailiff to take the cameraman into custody. When the trial reconvened, appellant moved for a mistrial, which was denied.

At a hearing on appellant's motion for new trial, appellant's trial attorney testified that the filming incident lasted fifteen to twenty seconds. The television cameraman testified that he was filming the outside door of the courtroom when the jurors walked out; that the camera was on ten to fifteen seconds; that the bailiff immediately told him to stop the filming and grabbed him and took him before the judge; and that he was grabbed in the presence of some jurors.

Juror Salazar did not recall the incident at all. He did remember seeing a television camera; however, he did not see the filming nor did he see camera lights. He did not discuss the matter with anyone, nor did he hear it mentioned during the jury deliberations. Juror Kingery saw the camera and the bright lights. She stated that while she was "pretty sure" that some jurors wondered what was happening, she did not remember any particular discussion. She thought that there was some mention of the incident by other jurors, but it was not discussed during deliberations. Juror Robb noticed the lights but did not recall ever discussing it then or during deliberations. Juror Cordes saw the camera and the cameraman being taken into custody and heard some jurors "wonder" if the cameraman was a reporter, but never heard it discussed again. Juror Bates stated that he saw the lights and heard others mention the lights, but that it was not discussed again. Juror Ward did not see any of the incident, but heard it mentioned by others. She did not recall any discussion of the incident during deliberations. Juror Langner recalled the incident because she saw the lights. She heard someone mention the cameraman but never discussed it with the others. She did hear about the cameraman's arrest on the radio later that day, but she did not hear the incident discussed during deliberations. Juror Maxwell recalled the incident, although he did not see anything. He heard about the cameraman and the arrest, but heard no more discussion of the matter, at that time or during deliberations. Juror Ramirez saw the cameraman but never heard anything else about the incident then or during deliberations. Juror Schuchardt saw the lights, heard about the cameraman and later learned of the arrest, but did not recall further discussion of the matter. Juror Frerichs saw the confusion and lights outside of the courtroom, was told about the cameraman and assumed that she was being photographed. However, she never heard reference made to the incident after the recess.[3]

Appellant contends that this one incident caused the jurors to be aware of community pressures, which deprived him of a fair and impartial jury trial. He relies upon *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), wherein convictions were reversed because of the extensive and pervasive intrusion by the news media into the trials.

In *Estes v. Texas*, supra, in addition to massive pre-trial publicity, pre-trial hearings were televised and recorded and the activities of the cameramen and photographers caused considerable disruptions. Trial witnesses and the original jury panel were "undoubtedly made aware of the peculiar public importance of the case by the press and television coverage being provided, and by the fact that they themselves were televised live and their pictures rebroadcast on the evening show." The Supreme Court held that the defendant had been deprived of due process, without the necessity of his showing actual harm and prejudice. The Court stated:

"The potential impact of television on the jurors is perhaps of the greatest significance. They are the nerve center of the fact-finding process . . . From the moment the trial judge announces that a case will be televised it becomes a *cause célèbre* . . . The approaching trial immediately assumes an important status in the public press and the accused is highly publicized along with the offense with which he is charged. Every juror carries with him into the jury box these solemn facts and thus increases the chance of prejudice that is present in every criminal case . . . The conscious or unconscious effect that this may have on the juror's judgment cannot be evaluated, but experience indicates that it is not only possible but highly probable that it will have a direct bearing on his vote as to guilt or innocence. Where pretrial publicity of all kinds has created intense public feeling which is aggrava-

---

3. The twelfth juror was subpoenaed, but did not appear to testify.

ted by the telecasting or picturing of the trial the televised jurors cannot help but feel the pressures of knowing that friends and neighbors have their eyes upon them. If the community be hostile to an accused, a televised juror, realizing that he must return to neighbors who saw the trial themselves, may well be led 'not to hold the balance nice, clear and true between the State and the accused.'" 381 U.S. at 545, 85 S.Ct. at 1634.

In *Sheppard v. Maxwell*, supra, the Supreme Court held that even in the absence of a showing of actual prejudice, the defendant was entitled to a new trial due to the "carnival atmosphere" of the trial, created by extensive publicity. Cameramen and photographers were constantly in and around the courtroom, photographing and filming the jury. There was also extensive daily news coverage of the trial, which saturated the community. The probability of prejudice to the defendant was so great that he was deprived of a fair trial consistent with due process.

Appellant contends that *Estes* and *Sheppard*, supra, require a reversal of any conviction where any of the jurors at trial were filmed and thereby made award of community interest in the outcome of the trial. We do not believe that this result is warranted by these decisions.

In both *Estes* and *Sheppard*, the filming and photographing of the jurors were factors which contributed to the atmospheres of prejudice which tainted the trials. In both cases, there were many more factors contributing to the climates created by the news media. The extensive pre-trial and trial publicity, coupled with the conduct of members of the news media and the sensationalism of the reporting, created presumptions of prejudice and harm to the defendants.

■ In the instant case, no such presumption of prejudice arises. The record reflects nothing more than an accidental filming of a few jurors for a 10 to 15 second period. Absent other facts, we hold that this one incident is not of sufficient magnitude to create a presumption of prejudice to

appellant by virtue of community pressures brought upon the jurors.

Since we hold that this incident alone is insufficient to raise a presumption of harm to appellant, we now turn to whether appellant was harmed in fact. The testimony in the hearing on the motion for new trial shows that the eleven jurors who testified were aware that the incident had occurred. However, their testimony clearly indicated that the incident was not discussed at length, and all testified that the incident was not discussed during deliberations. Appellant has made no showing of harm, and we do not infer harm from these facts before us.

■ Obviously, the jury was aware that this was a capital case, and as such was newsworthy in the community. We cannot conclude from the record before us that this incident served to bring community pressure upon the jurors or was of such a nature as to likely affect their verdict. See generally, *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977); *Adami v. State*, 524 S.W.2d 693 (Tex.Cr. App.1975); *Garcia v. State*, 513 S.W.2d 82 (Tex.Cr.App.1974); *Morris v. State*, 488 S.W.2d 768 (Tex.Cr.App.1973); *Johnson v. State*, 467 S.W.2d 247 (Tex.Cr.App.1971). Therefore, we hold that the trial court did not err in overruling appellant's motion for a mistrial. This second ground of error is overruled.

In his fourth ground of error, appellant contends that Art. 37.071, Vernon's Ann.C. C.P., is "constitutionally infirm in that its language engages in a presumption in favor of the state and places a burden upon the accused to rebut the presumption." Specifically, appellant asserts that the statute shifts the burden of proof to the defendant by requiring that in order to answer a special issue "No", ten or more jurors must agree.

■ This contention was decided adversely to appellant in *Brown v. State*, 554 S.W.2d 677 (Tex.Cr.App.1977). Therein we stated:

"At the guilt stage of the trial, in order to be acquitted, the defendant must receive 12 favorable votes. In order to convict, the State must receive 12 favorable votes. At the punishment stage of the trial, the procedure is the same with the exception that if a defendant has ten votes he receives a favorable verdict instead of a hung jury."

Further, Article 37.071(c) provides that the State must prove each special issue submitted beyond a reasonable doubt and in the instant case, the jury was so instructed. Therefore, the statute does not place the burden of proof upon the defendant to rebut any presumption in favor of the State. This ground of error is overruled.

In his fifth ground of error, appellant contends that "the trial court erred in receiving and making the jury's verdict on punishment the basis for appellant's judgment assessing the death penalty because the jury's verdict was vague and inconclusive as to special issue No. Three."

Article 37.071(b)(3), Vernon's Ann.C.C.P., provides that:

"(b) On conclusion of the evidence [at the punishment phase], the court shall submit the following issues to the jury:

\*     \*     \*     \*     \*     \*

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

In its charge to the jury on punishment, the court submitted the above issue as follows:

"Do you find from the evidence beyond a reasonable doubt whether the conduct of the defendant, Harvey Joseph Duffy, Jr., in killing the deceased was unreasonable in response to the provocation, if any, by the deceased?"

The jury returned an affirmative finding to this issue, as well as to the other special issues.

Appellant contends that the wording of the special issue was unclear, vague and inconclusive, and that any affirmative answer to it is ambiguous. He argues that compliance with the statute requires that the issue be submitted as "Do you find from the evidence beyond a reasonable doubt that . . . ." rather than "Do you find from the evidence beyond a reasonable doubt *whether* . . . ."

The record reflects that appellant made no objection to the charge, even though the trial court specifically called this special issue to appellant's attention. The acquiescence in and absence of an objection to the form of the charge waives all but fundamental error. *Rummel v. State*, 509 S.W.2d 630 (Tex.Cr.App.1974). See also *Elkins v. State*, 543 S.W.2d 648 (Tex.Cr.App. 1976); *Mott v. State*, 543 S.W.2d 623 (Tex. Cr.App.1976); *Singleton v. State*, 543 S.W.2d 138 (Tex.Cr.App.1976); *Harris v. State*, 522 S.W.2d 199 (Tex.Cr.App.1975); *Smith v. State*, 513 S.W.2d 823 (Tex.Cr.App. 1974). Therefore, nothing is presented for review.

Further, even if appellant had preserved this issue for review, there is no error in this portion of the charge. The charge submitted tracks the language of the statute, and therefore properly charges the jury on the statutory issue. Cf. *Sternlight v. State*, 540 S.W.2d 704 (Tex.Cr.App. 1973); *Bradford v. State*, 477 S.W.2d 544 (Tex.Cr.App.1974); *Frazier v. State*, 170 Tex.Cr.R. 432, 342 S.W.2d 115 (1961); *Barkley v. State*, 152 Tex.Cr.R. 376, 214 S.W.2d 287 (1948). The use of the word "whether" rather than the word "that" does not make this special issue vague or ambiguous, nor does this language render the jury's answer to the question inconclusive. This ground of error is overruled.

In his sixth ground of error, appellant contends that a sidebar remark by the prosecutor was prejudicial to appellant and that appellant was deprived thereby of a fair trial.

Upon · direct examination of a witness called by the State, the prosecutor tendered State's Exhibits Nos. 22, 23 and 24. These exhibits were photostatic copies of three checks made to appellant, purportedly

signed by the deceased, two dated the day of her death and one dated the day after her death. Appellant's counsel stated:

"MR. CONANT: Your Honor, we will object for two reasons. One, I submit the original would be the best evidence and, two, I don't—is there nothing on the back of the three hundred and twenty dollar check?

"MR. HARRIS (Prosecutor): No, on the copy.

"MR. CONANT: I realize there is nothing on the copy. was there anything on the original?

"MR. CONAWAY (Prosecutor): *Ask your client.*

"MR. CONANT: Your Honor, I ask that be stricken from the record.

"THE COURT: All right. I will warn you, don't make any more side bar remarks. You address yourself to me if you want to make any comments. I will give you the opportunity to argue the case when we get down to it but I am not going to tolerate that stuff. Do we understand each other?

"MR. CONAWAY: Yes, sir.

"THE COURT: You address your remarks to me   .   .   ." (Emphasis added).

Contrary to the State's brief, the remark did constitute a sidebar remark, which is not to be condoned. See *Felder v. State*, 564 S.W.2d 776 (Tex.Cr.App.1978); *Seaton v. State*, 564 S.W.2d 721 (Tex.Cr. App.1978); *Williams v. State*, 549 S.W.2d 183 (Tex.Cr.App.1977); *Sheppard v. State*, 545 S.W.2d 816 (Tex.Cr.App.1977); *Jones v. State*, 504 S.W.2d 906 (Tex.Cr.App.1974); *Barnes v. State*, 502 S.W.2d 738 (Tex.Cr. App.1973). However, in his objection, counsel for appellant simply asked that the remark be stricken from the record. The trial court quickly admonished the prosecution for the remark and directed him to refrain from further sidebar remarks. Counsel for appellant did not request further relief such as an instruction to the jury to disregard. Therefore, no error is preserved and no harm is shown. *Williams v. State*, supra; *Jones v. State*, supra; *Wash-*

*ington v. State*, 484 S.W.2d 721 (Tex.Cr. App.1972). Appellant's sixth ground of error is overruled.

In a multifarious ground of error, appellant next complains of the prosecutor's jury argument at the punishment phase of the trial.

The record reflects that the prosecutor argued:

"Now, when I was assigned to my job as assistant chief of Capital Crimes Section, I first thought it was a great honor, of course, an opportunity to work with Mr. Charles Conaway, the opportunity to work on the important cases, the cases such as the one you have heard this week and last week. Of course, it comes with somewhat mixed emotions because in working with these type of cases we have become intimately familiar with the victim, the family of the victims such as Mrs. Riley. I don't know if she is here today or not but she has been here the entire trial. To see the grief, to see the effect on the victims of the crime is sometimes hard to bear. But then on the other hand I get the chance to present to citizens of this community the evidence, to give it to representatives of the community and let them decide, let them do something with it. I have a chance to do something. Now you have a chance. You have the opportunity to do something about the situation that you have heard the last five days. You have gone one step toward doing something about a very brutal or very senseless, a very awful situation and I think now that you see—I have a six year old son. I have an eight year old son, too. But, primarily the six year old will watch a television program, watch a—

"MR. CONANT: Your Honor, if it please the court, I hate to object at this time but this is totally outside the record. We don't have any idea about what his sons watch on T.V. or what he is about to say about the T.V. I would object to the argument.

"THE COURT: Overruled. Let's proceed, counsel.

"MR. HARRIS: I was going to say that my son will watch a program of some kind showing an incident, a lot of violence. Not necessarily that, though, and he will turn to me and he will say, 'Is that real or is that fiction?' He doesn't say fiction. 'Is it real or is that just acting?' What you have seen today, what you have seen the last several days is real . . . ."

■ Appellant first contends that the trial court erred in permitting the prosecutor to bolster his associate prosecutor before the jury. No objection was made to this statement; therefore, nothing is presented for review. *Wilder v. State,* 558 S.W.2d 883 (Tex.Cr.App.1975); *Hunter v. State,* 530 S.W.2d 573 (Tex.Cr.App.1975); *Campbell v. State,* 525 S.W.2d 4 (Tex.Cr.App.1975); *Cox v. State,* 523 S.W.2d 695 (Tex.Cr.App.1975).

■ Appellant next contends that it was error for the prosecutor to refer to the instant trial as an "important case". Appellant did not object to this statement; therefore, nothing is presented for review. *Wilder v. State,* supra; *Hunter v. State,* supra; *Campbell v. State,* supra; *Cox v. State,* supra.

Appellant next complains of the statement concerning the prosecutor's "personal intimate familiarity with the victim's family." Appellant did not object to this statement; therefore, nothing is presented for review. *Wilder v. State,* supra; *Hunter v. State,* supra; *Campbell v. State,* supra; *Cox v. State,* supra.

■ Appellant next contends that the trial court erred in overruling his objection to the prosecutor's unsworn testimony concerning the effect of television on his son. Appellant's contention is correct; the prosecutor did refer to matters not in evidence. However, in order for an improper jury argument to constitute reversible error, it must either be extreme or manifestly improper or inject new and harmful facts. *Kerns v. State,* 550 S.W.2d 91 (Tex.Cr.App. 1977); *Bailey v. State,* 531 S.W.2d 628 (Tex.

Cr.App.1976); *Thomas v. State,* 519 S.W.2d 430 (Tex.Cr.App.1975). We do not find that the instant reference to matters not in evidence meets this test. Therefore, this error does not warrant a reversal of this conviction, and appellant's ground of error is overruled. *Brown v. State,* 535 S.W.2d 640 (Tex.Cr.App.1976); *Mayberry v. State,* 532 S.W.2d 80 (Tex.Cr.App.1976) (on motion for rehearing).

In his eighth ground of error, appellant contends that the trial court erred in overruling another objection to the prosecutor's jury argument at the punishment phase of the trial.

The record reflects that the prosecutor stated to the jury:

"Now it is up to you. No one can adequately punish this individual for taking that woman's life but you twelve people. No one can tell the community what will happen when you murder an eighty-year-old woman during the course of robbery except you twelve people."

Appellant objected to this statement on the ground that "it would bring in whether or not the punishment that this jury might meet (sic) out would be a deterrent effect on others in the community." He now contends that this argument injected improper references to community demands and expectations outside the record.

■ The trial court did not err in overruling appellant's objection; the argument by the prosecutor was a proper plea for law enforcement. *Shippy v. State,* 556 S.W.2d 246 (Tex.Cr.App.1977); *Hicks v. State,* 545 S.W.2d 805 (Tex.Cr.App.1977); *McCall v. State,* 540 S.W.2d 717 (Tex.Cr.App.1976); *Phillips v. State,* 511 S.W.2d 22 (Tex.Cr. App.1974); *Minafee v. State,* 482 S.W.2d 273 (Tex.Cr.App.1972). Therefore, no error is shown and this ground of error is overruled.

■ In his third ground of error, appellant contends that the evidence is insufficient to support the jury's affirmative answers to the issues submitted to them under Article 37.071, Vernon's Ann.C.C.P. This ground of error is multifarious and not in

compliance with Article 40.09(9), Vernon's Ann.C.C.P. However, in the interest of justice, we will consider these grounds of error. Article 40.09(13), Vernon's Ann.C.C.P.

Appellant contends that the evidence is insufficient to prove beyond a reasonable doubt that there is a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. We disagree.

The record reflects on the date of the offense appellant, then 24 years old, went to the deceased's house in rural Bexar County, where she lived alone. In his testimony, appellant stated that he wanted to borrow money from the deceased, although apparently he did not know her well. He stated that he needed money so he and his girlfriend could leave town. His financial situation was bad and he had previously quit his job. He stated that he could not live on his wages of $2.30 per hour, and that he had recently written a bad check. Because of his five prior convictions, he had served time in the penitentiary and was on parole at the time of the offense. He stated that he was "in trouble" with his parole officer. Appellant had learned that the deceased was an old woman who perhaps had a lot of money.

In his written confession, appellant stated that he first went up to the house and talked to the deceased about buying some turkeys. He then left her house, but returned 15 to 20 minutes later. When he then entered the house, he had the knife in his coat pocket. He stated that after he was in the house he took his knife out and stabbed the deceased in the chest. The deceased fell and began crawling and trying to run, while screaming for help. She crawled half way out of the front metal screen door, but appellant grabbed her and dragged her back in. She held onto the screen door which became twisted and bent. Inside the living room, appellant stabbed her more. He then dragged her by the back of her clothes into the bedroom and stole her checks and some coins. On his way out of the house, he dropped towels over the large puddles of blood on the living room floor.

The evidence reflects that the deceased was stabbed ten times by appellant. She was stabbed three times in the front of her chest, twice on her left side, four times in the back and once on her right side. The force of the blows fractured several of her ribs.

Appellant then drove away from the house, closing the front gate behind him. He then drove to Boerne where he forged and cashed one of the deceased's checks. Upon returning to San Antonio that evening, he took his girlfriend to eat at an expensive restaurant and at some point made a downpayment on a car, all from the proceeds of the forged check. During the following two days, appellant forged and cashed or attempted to cash several more of the deceased's checks, until he was apprehended.

Other evidence showed that appellant was twenty-five years old at the time of trial and had finished high school. Appellant had prior felony convictions for burglary of a habitation and forgery and three convictions for felony theft. The record reflects that all were committed within an eight day period in 1974 in three different counties. Appellant served the sentences concurrently, spent seventeen months in prison and was released on parole some six months prior to the commission of the offense. He stated that he was under the influence of drugs at the time of the offense, that he illegally possessed large amounts of the drug during the months before the offense and that he took the drugs often.[4]

Appellant testified that when he told the deceased that he wanted to borrow money from her, she became enraged, struck him with a cane and started screaming at him. He stated that this was why he stabbed her. Although he admitted stabbing the deceased, appellant maintained that he only stabbed her three times and that he did not know how she received the other seven stab wounds.

---

4. Appellant stated that the drug was Dilaudid, a pain killer.

At the punishment phase, after the State proved appellant's prior convictions, his family physician testified that appellant had never exhibited violence that the doctor knew of. A priest of a church which appellant had attended testified on direct examination that he was surprised to learn of the charges against appellant, but that he thought that appellant was the type of individual who would continue on a course of violence. However, he stated that he personally had detected no indication of violent behavior in appellant and that he did not feel that he was competent to predict future behavior. Appellant's parents also testified that to their knowledge appellant had not previously exhibited violent behavior.

Appellant testified that he was sorry that he killed the deceased, that he still did not believe that he did it, and that he would not do it again.

We conclude that the evidence is sufficient to support the jury's finding that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

It is clear that in assessing punishment the jury may consider all of the evidence adduced at trial on guilt or innocence. *Felder v. State,* 564 S.W.2d 776 (1978); *Brock v. State,* 556 S.W.2d 309 (Tex.Cr.App. 1977); *Burns v. State,* 556 S.W.2d 270 (Tex. Cr.App.1977); *Shippy v. State,* 556 S.W.2d 246 (Tex.Cr.App.1977); *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976). Indeed, the circumstances of the offense and the facts surrounding it may furnish greater probative evidence than any other evidence regarding the second special issue. See *Brock v. State,* supra; *Burns v. State,* supra; *Shippy v. State,* supra.

In the instant case, appellant went to the deceased's house thinking that she had money and intending to get money from her. The fact that he went armed is of probative value. See *Felder v. State,* supra. Cf. *Warren v. State,* 562 S.W.2d 474 (Tex.Cr.App.1978).

The deceased was an eighty-year-old woman, five feet tall, unlikely to be a physical threat to appellant or to be physically capable of pursuing him. See *Felder v. State,* supra; see also *Burns v. State,* supra.

Appellant brutally and viciously stabbed her ten times in the chest, side and back, with sufficient force to break ribs. See *Felder v. State,* supra; *Burns v. State,* supra; *Shippy v. State,* supra; *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr.App.1976).

When she ran from him after he first stabbed her, he followed her and dragged her screaming back inside the house as she held onto the door. He then continued stabbing her. Afterwards, he searched and found the checks and coins to steal. See *Smith v. State,* 540 S.W.2d 693 (Tex.Cr.App. 1976).

After the murder, he went on a three day forgery spree, cashing check after check until he was apprehended.

There was no evidence that appellant was under the influence or domination of anyone else; we have previously stated that this is probative evidence on special issue number two. *Hovila v. State,* 562 S.W.2d 243 (Tex.Cr.App.1978); *Robinson v. State,* 548 S.W.2d 63 (Tex.Cr.App.1977); *Smith v. State,* supra; *Jurek v. State,* 522 S.W.2d 934 (Tex.Cr.App.1975). Although appellant testified that he was under the influence of drugs at the time of the offense, that his financial situation was bad and that he was in trouble with his parole officer, the jury could conclude that this was not sufficient mental or emotional pressure to mitigate his actions. We have previously stated that the presence or absence of such pressure is probative on special issue number two. *Hovila v. State,* supra; *Robinson v. State,* supra; *Smith v. State,* supra; *Jurek v. State,* supra.

The evidence also reflects that appellant had five prior felony convictions. Although none of his prior offenses involved violence against persons, they were nevertheless probative as to appellant's pro-

pensity to commit criminal acts.[5] See *Felder v. State,* supra; *Smith v. State,* supra. That the offenses were all committed within an eight-day period and that appellant had only served time in prison once was probative evidence, perhaps in mitigation of punishment. However, the jury could have concluded that appellant was inclined to "crime sprees", especially in light of his conduct immediately after the murder. Further, at the time of the offense, the evidence indicated that appellant was lessening his attempts to rehabilitate himself and conform his conduct to the law while on parole. He had recently quit his job, written a bad check and was "in trouble" with his parole officer. Further, according to his own testimony, he had begun using drugs heavily. See generally, *Brock v. State,* supra; *Smith v. State,* supra.

Thus, on the record before this Court, it appears that appellant's entire conduct was calculated and remorseless, and the jury was justified in finding that the aggravating factors outweighed the mitigating factors and that this appellant would constitute a continuing threat to society. See *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). See and compare *Felder v. State,* supra; *Brock v. State,* supra; *Burns v. State,* supra; *Shippy v. State,* supra; *Granviel v. State,* supra; *Moore v. State,* supra; *Smith v. State,* supra; see also *Warren v. State,* supra.

▮ Appellant next contends that the evidence is insufficient to prove that his conduct which caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased would result, the first special issue submitted to the jury pursuant to Article 37.071(b)(1), Vernon's Ann.C.C.P. This contention is without merit. There is sufficient evidence to show that when appellant entered the deceased's house with a knife and began repeatedly stabbing her, he acted deliberately and with the reasonable

expectation that he would cause her death. See *Granviel v. State,* supra.

▮ Appellant also contends that the evidence is insufficient to justify an affirmative finding to special issue number three, submitted to the jury pursuant to Article 37.071(b)(3), Vernon's Ann.C.C.P. This statute requires the jury to determine "whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." We hold that the evidence is sufficient to justify an affirmative finding on this issue. Even if the jury believed appellant's testimony that the deceased "exploded" and began to strike him with a cane prior to the time he stabbed her, it could have easily concluded that his response in deliberately and repeatedly stabbing her ten times was unreasonable in response thereto, considering their relative sizes and probable strengths. See generally *Brown v. State,* 554 S.W.2d 677 (Tex.Cr. App.1977). Appellant's third ground of error is overruled.

The judgment is affirmed.

ROBERTS, J., concurs in the result.

5. Although these non-assaultive prior convictions are probative evidence, they are not dispositive of this issue. Upon other facts, this Court might be unable to hold that such convictions, by themselves, would constitute sufficient evidence for this special issue. See *Warren v. State,* supra.